UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| TERRENCE THOMAS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-10398-ADB |
| BARNSTABLE COUNTY CORRECTIONAL | * | |
| FACILITY, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

*Pro se* Plaintiff Terrence Thomas ("Thomas" or "Plaintiff"), who is detained at

Barnstable County Correctional Facility ("BCCF"), brings this action against prison officials,

Steve Montaldo, Officer Conley, and Major Montero,[1] (collectively, "BCCF Defendants"), and

Kerry Jarvis[2] (collectively, "Defendants").  [ECF No. 22].  He makes constitutional claims

against the BCCF Defendants related to interference with his mail, the recording of a meeting

with his attorney, and verbal harassment and racial discrimination, and against Defendant Jarvis,

a licensed mental health counselor, for inadequate medical care.  [Id.].  Currently before the

---

[1] The BCCF Defendants state that these names, which were listed on the docket based on
information from the Amended Complaint, are misnomers.  The BCCF Defendants do not
indicate if the spellings of their names are incorrect, their titles are incorrect, or both, and do not
provide the correct spellings or titles.  See, e.g., [ECF No. 95].

[2] Defendant Jarvis also states that "Kerry Jarvis" is a misnomer and indicates that the correct
spelling of her name is "Kiri Jarvis." [ECF No. 93 at 1].

Court are Defendants' motions for summary judgment, [ECF Nos. 91, 95], which, for the reasons set forth below, are <u>GRANTED</u>.

## I.      BACKGROUND

### A.      Local Rule 56.1

Local Rule 56.1 provides that "[a] party opposing [a] motion [for summary judgment] shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documents." L.R. 56.1.  Thomas did not file a statement that complies with this requirement; instead, in his oppositions to Defendants' motions, he contested specific facts asserted by Defendants.  <u>See</u> [ECF Nos. 99, 100].  Local Rule 56.1 also states that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." L.R. 56.1.

Nevertheless, "'[d]istrict courts enjoy broad latitude' in adopting and administering such local rules." <u>NEPSK, Inc. v. Town of Houlton</u>, 283 F.3d 1, 6 (1st Cir. 2002) (quoting <u>Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.</u>, 26 F.3d 220, 224 (1st Cir. 1994); <u>see also</u> <u>Ramsdell v. Bowles</u>, 64 F.3d 5, 7 (1st Cir. 1995) (noting district court's "great leeway in the application and enforcement of its local rules").  As such, "[w]here a party opposing a motion for summary judgment fails to comply with Local Rule 56.1, the court has the discretion to decide whether to impose the sanction of deeming the moving party's factual assertions to be admitted." <u>Butters v. Wells Fargo Advisors, LLC</u>, No. 10-cv-10072, 2012 WL 5959986, at *2 (D. Mass. Nov. 27, 2012) (citing <u>Swallow v. Fetzer Vineyards</u>, 46 F. App'x 636, 638–39 (1st Cir. 2002)) (further citation omitted); <u>Plourde v. Sorin Grp. USA, Inc.</u>, 517 F. Supp. 3d 76, 81 (D. Mass. 2021) (quoting <u>Butters</u>, 2012 WL 5959986, at *2) (same).

Additionally, courts "are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, we hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects." Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008) (citations omitted).  Nonetheless, "self-representation is not 'a license not to comply with relevant rules of procedural and substantive law.'" Andrews v. Bechtel Power Corp., 780 F.2d 124, 140 (1st Cir. 1985) (citation omitted).  "Thus, the Court will consider a pro se movant's circumstances when reviewing his motion for summary judgment but will not provide 'extra procedural swaddling.'" Grossman v. Martin, 566 F. Supp. 3d 136, 143 (D.R.I. 2021) (quoting Eagle Eye Fishing Corp. v. U.S. Dep't of Com., 20 F.3d 503, 506 (1st Cir. 1994)).

Pursuant to the Court's discretion and in light of Thomas's *pro se* status, the Court will consider any factual disputes specifically raised by Thomas and/or the summary judgment record.  If undisputed, the facts stated in Defendants' statements of material facts are deemed admitted, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.

**B.    Material Facts**

1.    BCCF Grievance Policy

BCCF maintains a detailed grievance policy ("Grievance Policy"), a version of which was in effect during the period at issue.  [ECF No. 97 ¶ 6]; see also [ECF Nos. 93-7, 97-5].  The Grievance Policy is explained in the Inmate Handbook, which Thomas received on June 23, 2019, and which notifies individuals incarcerated at BCCF of their right to file grievances concerning the conditions of their incarceration and the decisions of BCCF staff.  [ECF No. 97 ¶¶ 7–8]; see also [ECF No. 97-6 at 17–18].

The steps in Grievance Policy are as follows:

- The Complainant must first communicate their complaint to the Unit Officer, who will attempt to reach an informal resolution.  [ECF No. 97 ¶ 9].

- If an informal resolution cannot be reached, the Complainant must document the grievance by completing a grievance form (which may only address one grievance) and placing it in the unit's grievance box.  [Id. ¶¶ 10–11; ECF No. 93 ¶ 23].

- If a grievance is improperly filed, it will be returned to the Complainant with a written explanation.  [ECF No. 97 ¶ 12].

- If the grievance is properly filed, it is first reviewed by the Unit Manager.  The Unit Manager will then forward the grievance form to the Assistant Deputy Superintendent, for non-medical grievances, and the Health Services Administrator ("HSA"), for medical grievances.  If the Unit Manager resolves the grievance, the Unit Manager will note on the grievance form that it has been resolved, both the Unit Manager and the Complainant will sign and date the form, and the Unit Manager will note the resolution in the electronic inmate management system.  If the Unit Manager does not resolve the grievance, the Unit Manager will note their recommendations on the form.  [ECF No. 93 ¶ 24; ECF No. 97 ¶¶ 13, 18].

- Upon receipt of a grievance form from the Unit Manager, the Assistant Deputy Superintendent/HSA will decide whether to approve, deny, or partially-approve the recommendations of the Unit Manager and will notify the Complainant of the decision along with their right to appeal the decision to the Superintendent.  [ECF No. 93 ¶ 24; ECF No. 97 ¶ 14].

- To appeal a grievance decision, the Complainant must notify the Superintendent of their intent to appeal within two workdays after receiving a response from the Assistant Superintendent, at which point the Superintendent will approve, deny, or modify the recommendations of the Assistant Deputy Superintendent and provide a written response to the Complainant within 30 days.  [ECF No. 93-7 at 5; ECF No. 97 ¶ 15].

- The Superintendent will not accept an appeal unless it has followed the proper grievance procedure.  [ECF No. 97 ¶ 16].

- When the grievance is settled, withdrawn, or resolved, the original grievance form will be returned to the Complainant.  [Id. ¶ 19].

2.   Mail Interference

Thomas alleges three incidents of BCCF staff interfering with his mail:

4

a.      July 2020 Incident

On July 29, 2020, Thomas alleges that Defendant Montaldo attempted to force him to accept mail from his counsel in an ongoing litigation (unrelated to this action), which had been opened and held by BCCF staff from July 22, 2020 to July 29, 2020.  [ECF No. 97 ¶ 20].  Thomas had previously reviewed the contents of the letter with his attorney, and claims that when he received the letter, several pages were missing.  [Id. ¶¶ 21–23].  He did not see who had opened the mail.  [Id. ¶ 24].  Thomas initially refused to accept the mail and that day requested a grievance form from Defendant Montaldo, completed it, and submitted it by placing it in the grievance box (Grievance Form #18-000-0488).  [Id. ¶¶ 25–26]; see also [ECF No. 97-8].  The form was signed by Thomas's Unit Manager, who indicated that the matter was not resolved.  [Id.].

Defendant Montero, the Assistant Deputy Secretary, reviewed the form and reached a decision on July 30, 2020.  [ECF No. 97-8].  In the "Decision" field of the grievance form, rather than selecting "Approve" or "Disapprove," Defendant Montero handwrote the word "modified," and included a comment indicating that Thomas should see another page of the form for an explanation of his response.  [Id. at 3].  That page, however, does not appear to have been filed by either side.  [Id.].  Although the BCCF Defendants attached a page to this grievance, it seems to apply to a different grievance, related to a later October 2020 alleged incident of mail interference.  [Id. at 4].  Before Thomas received the grievance form back, he accepted the legal mail.  [ECF No. 97 at ¶ 27].

The parties dispute what followed.  The BCCF Defendants aver that on August 4, 2020, Thomas received the grievance form back, reviewed it, checked off that he did not intend to appeal its denial, and signed and dated the form.  [ECF No. 97 at ¶ 28].  Thomas disputes this,

saying that he "checked the box for an appeal" but "no appeal was given to [him] by [BCCF]," though he does not indicate how he was deprived of the appeal process. [ECF No. 100 at 1]. On the copy of the grievance form filed by the BCCF Defendants, Thomas checked the box indicating that he did not intend to appeal the decision, [ECF No. 97-8 at 3]; however, on the copy of the form filed by Thomas, that checkbox is crossed out and he instead checked the box indicating that he did intend to appeal the decision, [ECF No. 100-1 at 1]. Neither party has provided an explanation for these two conflicting versions of the same document, but in his deposition, Thomas stated that he indicated on the form that he would not appeal because "[Montero] told [Thomas] it wasn't going to happen again" and that the opening of his mail "was a mistake." [ECF No. 97-1 at 94:21–95:7].

              **b.**       September 2020 Incident

Thomas alleges that, in September 2020, BCCF prison officials threw away mail from his family, including copies of police reports, which Thomas's family members had attempted to send on three occasions, but which Thomas never received. [ECF No. 97 ¶¶ 29–31]. Thomas further alleges that Defendant Montero was aware that this mail was thrown away but did nothing. [Id. ¶ 29].[3]

---

[3] The BCCF Defendants do not assert that Thomas failed to exhaust his administrative remedies for this incident, and as such do not address whether Thomas filed a grievance form following this incident, or, if a grievance form was filed, what followed. Thomas states that he filed a grievance form (Grievance Form #18-000-0513) related to this incident, a copy of which he filed here, [ECF No. 100-1 at 5–6]. The form indicates that his Unit Manager received the form on October 1, 2020, and that Defendant Montero, Assistant Deputy Secretary, reviewed and denied the requested relief on November 17, 2020. [Id. at 6]. Defendant Montero's comment indicates that Thomas should see another page of the form for the explanation as to why the grievance was denied, but that page was not provided by either side. [Id.]. Thomas signed off on the denial by Defendant Montero, but the section indicating whether or not he intended to appeal that decision was left blank. [Id.]. Thomas states that Defendant Montero did not "give [him] a chance to appeal"; that he "just disaproved [sic] and left" and told Thomas that "[he] would never win against [Defendant Montero's] officers." [ECF No. 100 at 2]. During his deposition, Thomas

c.      October 2020 Incident

Thomas further alleges that, on October 14, 2020, Defendant Montaldo placed three pieces of opened legal mail from the Barnstable County Superior Court in the handle of his door. [ECF No. 97 ¶ 32].  Thomas did not see who had opened the letters and refused to accept them; he did not review the contents and returned them to Defendant Montaldo.  [Id. ¶¶ 33–35].[4]

3.      Recording of Attorney Meeting

Thomas alleges that on October 21, 2020, a female employee at BCCF placed him and his attorney in a room in the BCCF visiting area, where their conversation was recorded.  [ECF No. 97 ¶ 46].  Thomas stated at his deposition that he noticed the camera and microphone as soon as he and his attorney entered the room, but nevertheless proceeded to have a conversation with his attorney for approximately 45 minutes.  [Id. ¶¶ 47–49].  Thomas did not speak with any BCCF employees or officials about the recording equipment before their meeting.  [Id. ¶ 49].

_____

stated that the initial form was never returned to him, [ECF No. 97-1 at 108:1–13], though the form he filed appears to indicate that it was returned to him on November 17, 2020, [ECF No. 100-1 at 6].

[4] The BCCF Defendants also do not assert that Thomas failed to exhaust his administrative remedies for this claim and therefore again do not address whether a grievance form was submitted.  Thomas states that he did file a grievance form (Grievance Form #18-000-0516) and filed a copy of the form here.  [ECF No. 100 at 2; ECF No. 100-1 at 4].  His Unit Manager received the form on October 15, 2020 and noted that the matter was not resolved.  [Id.].  The second page of the form (which would indicate whether the Assistant Deputy Superintendent reviewed the form, the disposition following that review, and whether Thomas had indicated that he intended to appeal that decision) was not filed by either side.  [Id.].  As noted above, the BCCF Defendants filed a page attached to Thomas's earlier grievance that references this grievance form number.  [ECF No. 97-8 at 4].  That page, which was signed by Defendant Montero and dated November 17, 2020, states that Thomas's 10/14/2020 mail was opened "in [error]" due to a "mistake in processing [Thomas'] mail," and that "[BCCF] Staff are not target[ing] . . . Thomas or trying in any way to get involved in his legal matters."  [Id.].  Thomas again states that he "was not given a chance to appeal" and was told by Montero that he "would never win against his officers."  [ECF No. 100 at 1].

Thomas submitted an inmate request form related to this incident to Defendant Montero. [ECF No. 97 ¶ 50; ECF No. 97-11].  Thomas stated at his deposition that he did not file a grievance form because Defendant Montero told him to file an inmate request form instead. [ECF No. 97 ¶ 53; ECF No. 97-1 at 124:11–16].  The form was denied on November 12, 2020, with a comment from Defendant Montero stating that he could "assure [Thomas] that [the meeting] was not video and audio recorded."  [ECF No. 22-1 at 10].  Thomas alleges that Defendant Montero "[declined] to investigate" the incident and told him that he "would never win against [Montero] or his officers."  [ECF No. 22 at 3–4].  Thomas conceded at his deposition that he did not file a grievance form or continue to appeal.  [ECF No. 97 ¶ 51; ECF No. 97-1 at 124:8–16].  He also claimed that there was no way to file an appeal of a denial of an inmate request form.  [Id. at 124:10].

    4. <u>Verbal Harassment and Racial Discrimination</u>

Thomas alleges that on November 12, 2020, Defendant Conley verbally harassed him and discriminated against him.  [ECF No. 97 ¶ 36].  Thomas further asserts that Defendant Conley made several racially derogatory slurs towards him, and that Defendant Conley disproportionately enforced BCCF rules related to uniforms against him, as compared to white individuals.  [Id. ¶¶ 37, 39].  Thomas claims to have filed a grievance in response to his interactions with Defendant Conley, but neither party has filed a copy of the form.  [Id. ¶ 40].  Thomas claims that the form was returned to him because it was overbroad, and that he did not appeal.  [Id. ¶¶ 41–42].

     5.   <u>Medical Care</u>

Defendant Jarvis, who served as a licensed mental health counselor at BCCF during the period at issue, first saw Thomas on June 25, 2019.[5]  [ECF No. 93 ¶¶ 7–8; ECF No. 93-4 at 2].  At this visit, Thomas reported a history of depression and anxiety, denied that he had any current mental health symptoms, and stated that he took Zoloft and Trazadone.  [ECF No. 93 ¶ 8].  Thomas also stated that he had last taken this medication on June 23, 2019.  [ECF No. 93-4 at 2].  Another BCCF staff member subsequently called Thomas's pharmacy to confirm his medication; the pharmacy indicated that Thomas had last filled his Zoloft and Trazadone prescriptions in February 2019 for 30-day supplies.  [ECF No. 93 ¶ 9].

On October 8, 2019, Defendant Jarvis saw Thomas again for a restrictive housing assessment where she noted that, per her chart review, Thomas was not presently taking any psychotropic medications.  [ECF No. 93 ¶ 10].  She also noted that he stated he was doing well on his unit and that he denied having any current mental health symptoms.  [<u>Id.</u> ¶ 11].

On December 12, 2019, Thomas was seen by another member of the medical staff, who noted that he again denied having current mental health symptoms but expressed frustration with the mental health protocol and "abruptly ended contact."  [ECF No. 93 ¶ 12].

On January 8, 2020, Defendant Jarvis saw Thomas for another restrictive housing assessment.  [ECF No. 93 ¶ 13].  At this visit, Defendant Jarvis again noted that Thomas did not have a diagnosis for a serious mental illness and was not on psychotropic medication.  [<u>Id.</u>].  She also noted that he had "identified adaptive coping skills that he uses to manage his anxiety (meditation)," there was no "[n]o evidence of psychosis, mania, or hypomania," and "[n]o acute

---

[5] Defendant Jarvis's SOMF states that she saw Thomas for the first time on June 26, 2019, but Thomas's medical records, attached to Defendant Jarvis's SOMF, indicate that the visit occurred on June 25, 2019.  [ECF No. 93-4 at 2].

distress observed or reported." [ECF No. 93-4 at 8]. Defendant Jarvis provided Thomas with "psycho-educational handouts" and placed him "on the mental health line" for follow up. [ECF No. 93 ¶ 13].

Several months later, on March 3, 2020, Thomas was seen by another provider for another restrictive housing assessment. [ECF No. 93 ¶ 14]. At this assessment, he "expressed frustrations with the facility and was not receptive to feedback or support," but did not report having any acute mental health concerns. [Id. ¶¶ 14–15]. The provider noted "[n]o evidence of mania, hypomania or psychosis" and documented that "[m]ental health [would] follow up per protocol and PRN." [ECF No. 93-4 at 10].

On June 3, 2020, he was seen by the same provider when he again denied having any mental health symptoms or concerns or "issues in functioning." [ECF No. 93 ¶¶ 16–17]. The provider also had no acute concerns, [id.], and again documented that "[m]ental health [would] follow up per protocol and PRN," [ECF No. 93-4 at 11].

On September 1, 2020, Thomas filed a grievance (Grievance # 18-000-0498), complaining that he had been trying to get mental health medication for over a year. [ECF No. 93 ¶ 27; ECF No. 93-3 at 2]. His grievance was responded to and denied by the HSA, who concluded that Thomas did not have any active medications when he came to BCCF in June 2019, because his prescribed medications had not been picked up since February 2019, and that mental health providers had been meeting with Thomas. [ECF No. 93 ¶¶ 28–31]. Thomas did not appeal the decision, [id. ¶¶ 32–33], but stated in his deposition that the grievance form was never returned to him, [ECF No. 93-6 (Thomas Dep.) at 158:5–10]. Neither party has produced a copy of the grievance form.

Several days later, on September 3, 2020, Defendant Jarvis saw Thomas for a 90-day special management update, at which time he reported that he wanted medication.  [ECF No. 93 ¶ 36].  "Despite encouragement," he would not identify current mental health symptoms.  [Id. ¶ 37; ECF No. 93-4 at 11].  Defendant Jarvis documented that there was "[n]o evidence of psychosis, mania, or hypomania" and that Thomas did not appear to be in acute distress.  [ECF No. 93 ¶ 38].  Once again, Defendant Jarvis noted that "[mental health] [would] follow up per protocol and PRN."  [ECF No. 93-4 at 11].

On December 7, 2020, Thomas was seen again by another provider for a follow-up. [ECF No. 93 ¶ 39].  At that visit, he reported that he was having trouble sleeping and was referred to mental health "regarding previous psych medications."  [Id.].

On January 22, 2021, Defendant Jarvis saw Thomas for another visit.  The notes from this visit indicate Thomas was seen "at the request of BCCF Admin." after "BCCF Admin." receiv[ed] a letter/email from [Prisoners' Legal Services]" asserting that Thomas was "not receiving psychotropic medication," because he "was being discriminated against."  [ECF No. 93-4 at 14].[6]  Defendant Jarvis again documented that Thomas's medications were not current upon intake and were not ordered as a result.  [ECF No. 93 ¶ 40].  Defendant Jarvis also documented that Thomas requested medication for his PTSD, and, although "[a]t first, he did not want to cooperate when encouraged," Thomas reported that he was experiencing a number of symptoms, including nightmares, paranoia, and anxiety.  [Id. ¶ 42; ECF No. 93-4 at 16].  At this visit, Defendant Jarvis informed Thomas that he would "be placed on the mental health line for [a] second opinion . . . to see a psychiatrist provider," which Thomas was receptive to, and she

---

[6] Thomas filed copies of letters from Prisoners' Legal Services of Massachusetts to BCCF regarding his mental health treatment, dated December 17, 2019, January 15, 2020, and January 21, 2021.  See [ECF No. 13].

also told Thomas that BCCF did not prescribe sleep medication, which agitated Thomas.  [ECF No. 93 ¶ 44].

Several days later, on January 25, 2021, Thomas was seen by another provider and was told that his case would be reviewed by the mental health team.  [ECF No. 93 ¶ 47].

On February 17, 2021, he was seen by the same provider, at which time he reported ongoing nightmares and was referred to psychiatry.  [ECF No. 93 ¶ 48].  He was seen by a nurse practitioner the next day, who diagnosed him with a not-otherwise-specified mood disorder and PTSD and prescribed Zoloft and Zyprexa.  [Id. ¶ 49].  This visit occurred roughly a year and nine months after Thomas was initially incarcerated at BCCF.  See [ECF No. 99 at 1].  Thomas since had at least three subsequent follow-up appointments at which he was reported to be doing well, and he, at least as of October 2022, was still prescribed medication.  [ECF No. 93 ¶¶ 50–53].

Thomas states that on many occasions Defendant Jarvis told Thomas: (1) he was not going to receive his medication, and (2) she was going to make him an appointment with the psychiatrist, but Thomas did not meet with a psychiatrist until February 2021. [ECF No. 99 at 1]. Thomas further states that Defendant Jarvis also told him he would have twice weekly visits with a mental health provider but that did not happen.  [Id.]  Thomas further avers that he filed many grievances related to his mental health care in addition to the September 1, 2020 grievance discussed above.  [Id. at 2].

## C.    Procedural Background

Plaintiff's amended complaint, docketed on July 1, 2021, alleges: (1) that Defendants Montaldo and Montero unlawfully tampered with and otherwise interfered with his mail; (2) that Defendant Conley verbally harassed him because of his race; (3) that Defendant Montero was

responsible for unlawfully recording a conversation between him and his attorney; and (4) Defendant Jarvis refused to treat him for mental health issues for 21 months, resulting in deterioration of his mental health.  [ECF No. 22]; see also [ECF No. 50 at 1–2].

Defendant Jarvis moved to dismiss the claims brought against her on September 22, 2021, [ECF No. 37], and the BCCF Defendants moved for a more definite statement on September 27, 2021, [ECF No. 40].  On March 8, 2022, the Court granted Defendant Jarvis's motion to dismiss only as to the claim of racial discrimination and denied the remainder of the motion.  [ECF No. 50].  The Court also construed Plaintiff's claim for inadequate medical care as an Eighth Amendment claim.  [Id.]; see also [ECF No. 56 (letter from Thomas confirming that he is asserting a federal claim for "deliberate indifference" rather than a state medical malpractice claim)].  The Court denied the BCCF Defendants' motion but dismissed claims against them in their official capacities to the extent Thomas had asserted them.  [ECF No. 50].

On October 20, 2022, Defendant Jarvis moved for summary judgment on the remaining claim against her, [ECF No. 91], which Thomas opposed on November 7, 2022, [ECF No. 99]. The BCCF Defendants moved for summary judgment on all claims against them on October 24, 2022, [ECF No. 95], which Plaintiff opposed on November 8, 2022, [ECF No. 100].

## II.      LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue

exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. "The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and 'support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality.'" McFee v. Lund, No. 18-cv-11158, 2021 WL 5310755, at *3 (D. Mass. Nov. 15, 2021) (alteration in original) (quoting Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003)).

> "To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the court] to specific evidence in the record that would be admissible at trial. That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the nonmoving party will be unable to carry its burden of persuasion at trial.'"

Ocasio-Hernandez v. Fortuno-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (second alteration in original) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).

When reviewing the record, the Court "must take the evidence in the light most flattering to the [non-moving party], indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted). The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." Fontanez-Nuñez v. Janssen Ortho LLC, 447 F.3d 50, 54–55 (1st Cir. 2006) (citation omitted). "The factual conflicts upon which he relies must [also] be both genuine and material." Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III.     DISCUSSION

### A.     Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Proper exhaustion of administrative remedies entails "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford v. Ngo, 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). Incarcerated individuals "must 'complete the administrative review process in accordance with the applicable procedural rules'—rules that are defined . . . by the prison grievance process itself." Jones v. Bock, 549 U.S. 199, 218 (2007) (quoting Woodford, 548 U.S. at 88).

Exhaustion is not "left to the discretion of the district court" but is considered "mandatory." Woodford, 548 U.S. at 85. A court "may not excuse a failure to exhaust, even to take [special] circumstances into account." Ross v. Blake, 578 U.S. 632, 639 (2016). That said, remedies must be "available," meaning that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" Id. at 642 (citing Booth v. Churner, 532 U.S. 731, 738 (2001)). An administrative remedy is "available" under the PLRA even if it is an "optional, rather than mandatory," avenue for review. Johnson v. Thyng, 369 F. App'x 144, 147 (1st Cir. 2010) (finding failure to exhaust where plaintiff did not file a level-three appeal pursuant to a grievance procedure that stated, "[i]f an inmate is not satisfied with the Warden/Director's response, he/she

*may* file an appeal using the grievance form, to the Commissioner's office" (emphasis added)). On the other hand, an administrative remedy is unavailable where (1) "it operates as a simple dead end . . . with officers unable or consistently unwilling to provide any relief to aggrieved inmates," (2) where it is "so opaque that it becomes, practically speaking, incapable of use," or (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  Ross, 578 U.S. at 643–44.

"[F]ailure to exhaust is an affirmative defense under the PLRA," Jones, 549 U.S. at 216, and, as such,

> [a]t the summary judgment phase, defendants bear the initial burden of showing that plaintiff failed to exhaust generally available administrative remedies.  Then, the burden shifts to the [plaintiff] to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him.

McFee, 2021 WL 5310755, at *4 (internal citations and quotation marks omitted).

### 1.    July 2020 Mail Interference

As to his claims of mail interference, the BCCF Defendants argue that Thomas did not exhaust his administrative remedies for the July 2020 incident because, after he filed a grievance and his request for relief was denied, "he could have, but did not, appeal the denial."  [ECF No. 96 at 7].[7]  Thomas responds that he checked the box indicating his intent to appeal on this specific grievance form, [ECF No. 100 at 1–2], but also asserted in his deposition, conversely, that Defendant Montero assured him that the opening of his mail was a mistake that would not happen again and thus convinced him not to appeal, [ECF No. 93-1 at 94:5–95:7].  As noted above, the copy of the grievance form filed by the BCCF Defendants shows that Thomas

---

[7] As noted above, the BCCF Defendants do not contest that Thomas exhausted his administrative remedies for the September and October incidents.  [ECF No. 96 at 7].

checked the box indicating he would not appeal, while the version Thomas filed shows that he crossed that out, and instead checked the box indicating he would appeal.  [ECF No. 97-8 at 3; ECF No. 100-1 at 1].

In McFee v. Lund, No. 18-cv-11158, 2021 WL 5310755 (D. Mass. Nov. 15, 2021), another session of this Court found that summary judgment was inappropriate where plaintiff alleged that "staff refused to file grievances on his behalf because they told him he was filing too many grievances[,]" and defendants submitted records showing that "plaintiff typically [filed] one grievance per month" but filed none in the two months preceding the civil action.  Id. at *4–5.  The court found that "[i]f admitted, [the] records and plaintiff's testimony could allow a jury to infer that either plaintiff filed no grievances . . . or that he attempted to file grievances that staff refused to process," and denied defendants' motion for summary judgment because there was "a genuine issue of material fact regarding whether plaintiff's efforts to pursue administrative remedies were thwarted, which would excuse his failure to exhaust those remedies."  Id. at *4.  Similarly in Russo v. Honen, 755 F. Supp. 2d 313, 315 (D. Mass. 2010), another session of this Court declined to grant summary judgment where plaintiff alleged he was "denied access to, or use of, the grievance forms," and "defendants . . . provided no evidence or statement to counter [plaintiff's] allegations," holding that "[u]nless, and until, the defendants respond with evidence to the contrary, there remains a genuine issue of material fact as to whether [plaintiff] was denied access to inmate grievance forms."

This case presents a closer question than either McFee or Russo.  Thomas has (1) alleged, as in McFee and Russo, that he wanted to but was denied the opportunity to appeal the denial of his grievance, and (2) provided a copy of the grievance which seems to evince an intent to appeal.  On the other hand, unlike McFee or Russo, Defendants have presented conflicting

evidence that would seem to show the opposite, including (1) Thomas's deposition testimony
conceding that he did not appeal, and (2) a copy of the grievance form showing that he did not
check the box indicating an intent to appeal.  Nevertheless, given that Thomas is *pro se* and was
not represented at his deposition, that he could testify at a trial that he intended to appeal, and in
light of the contradictory versions of the grievance form that were filed, the Court finds that there
is a genuine issue as to whether Thomas was denied the opportunity to appeal, and thus whether
his unexhausted administrative remedies were available to him.  Summary judgment will not,
therefore, be granted on this ground.

### 2.    Recording of Attorney Meeting

The BCCF Defendants also argue that Thomas did not exhaust his administrative
remedies for his claim related to the alleged recording of a meeting with his attorney, because,
although he filed an inmate request form, he never filed a grievance.  [ECF No. 96 at 16].
Thomas did not respond to this point in his opposition but claimed at his deposition that he filed
an inmate request form, rather than a grievance, at Defendant Montero's urging and because
Defendant Montero told him he would not succeed in getting any relief through the grievance
process.  See [ECF No. 97-1 at 124:10–16].  Based on the record before it, the Court finds there
are material disputed issues related to Thomas's exhaustion of his administrative remedies for
this claim.  A reasonable jury could find that Defendant Montero misrepresented the appropriate
action by insisting that Thomas file an inmate request form instead of a grievance and that this
effectively rendered Thomas's administrative remedies unavailable.  See Ross, 578 U.S. at 644
("[W]hen prison administrators thwart inmates from taking advantage of a grievance process
through . . . misrepresentation . . . , such interference with an inmate's pursuit of relief renders
the administrative process unavailable.").  Alternatively, a jury could find that Defendant
Montero mislead Thomas into believing that filing the inmate request form was alone sufficient

18

to exhaust his administrative remedies.  See, e.g., Hardy v. Shaikh, 959 F.3d 578, 585 (3d Cir.

2020) ("We have long recognized that misleading as well as clearly erroneous statements can

render a grievance process unavailable . . . . [In a previous case,] we found that [the plaintiff]

was 'entitled to rely' on [prison staff's] 'misleading' instructions and that by giving the inmate

advice 'at odds' with the grievance process (to wait until the investigation was concluded) and

then omitting crucial information from him (whether the investigation had concluded) . . . , the

prison staff so misled him that they thwarted his ability to pursue relief through the grievance

process, rendering it unavailable." (quoting Brown v. Croak, 312 F.3d 109, 112 (3d Cir. 2002)).

Summary judgment will not be granted on this ground.

### 3.   Verbal Harassment and Racial Discrimination

The BCCF Defendants also argue that Thomas did not exhaust his administrative

remedies for his claims of verbal harassment and racial discrimination, because, despite

Thomas's assertions that he filed a grievance and it was returned to him because he had included

multiple allegations in a single grievance, there is no record of a grievance related to these

claims.  [ECF No. 96 at 12–13].  Further, even assuming Thomas did file a grievance that was

returned to him, the BCCF Defendants argue that Thomas would have been required to re-file his

grievance, and Thomas admitted at his deposition that he did not take those steps.  [Id.].

An incarcerated individual "cannot exhaust his administrative remedies by failing to

follow the required procedural steps, and the proper return of an improperly filed grievance does

not serve to exhaust a prisoner's administrative remedies."  Adams v. Monahan, No. 17-cv-

00261, 2018 WL 387392, at *6 (D. Me. Jan. 11, 2018) (quoting Godbey v. Wilson, No. 12-cv-

01302, 2014 WL 794274, at *5 (E.D. Va. Feb. 26, 2014)), R. & R. adopted, No. 17-cv-00261,

2018 WL 845546 (D. Me. Feb. 13, 2018).  Even assuming that Thomas filed a grievance form,

the Grievance Policy states that each form must only include one grievance and that improperly

filed forms would be returned, and Thomas conceded at his deposition (1) that the grievance he filed had been returned to him and (2) he did not seek an appeal after that.  Thomas has not presented any evidence refuting those concessions.  The Court therefore finds that Thomas failed to exhaust as to this claim and the BCCF Defendants' motion for summary judgment on this claim is GRANTED.

        4.     Medical Care

Finally, Defendant Jarvis contends that Thomas failed to exhaust his administrative remedies as to his medical claim, because (1) he never filed a grievance specifically about Defendant Jarvis, instead filing a "general grievance about medications," and (2) he failed to appeal the denial of his September 1, 2020 grievance.  [ECF No. 92 at 9–10].  Thomas responds that he was denied his chance to appeal because he filed many grievances but never received any of them back.  [ECF No. 99 at 2].

With regards to Defendant Jarvis's argument concerning the level of generality of Thomas's September 1, 2020 grievance: the Supreme Court has held that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Jones, 549 U.S. at 218.  "[E]xhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances," and where a grievance policy "make[s] no mention of naming particular officials, . . . imposing such a prerequisite to proper exhaustion is unwarranted."  Id. at 218–19.  Here, there is no such requirement in BCCF's Grievance Policy.  See [ECF No. 93-7].  As such, summary judgment will not be granted on this ground.

Next, BCCF's Grievance Policy defines a grievance as a "written complaint by an inmate concerning a specific incident, specific condition or confinement, or the application of any

facility policy, rule or regulation for which redress is sought." [ECF No. 93-7 at 3]. The Grievance Policy also states that "[o]nly one grievance shall be addressed on a Grievance Form," and "[a]ll Grievance Forms shall be submitted to the Unit Manager within ten (10) work days of the incident or complaint." [Id. at 4]. Based on these requirements, Thomas's September 1, 2020, grievance in which he generally complained about not being able to get medication for over a year, rather than specifically identifying individual instances of being denied medication, could be read to be overly general, impermissibly raising multiple grievances, or filed too late.

That said, even assuming that Thomas's September 1, 2020, grievance was defective and therefore "improperly filed," the Grievance Policy also states that improperly filed grievances "shall be returned to the inmate with a written explanation," [ECF No. 93-7 at 4], and "a prisoner's access to the second level of review is conditioned on" that return, Adams, 2018 WL 387392, at *6 n.9. Thomas has alleged that the September 1, 2020, grievance was not returned to him and Defendant Jarvis has not presented evidence controverting that assertion. "Therefore, where [as here, the plaintiff asserts and the defendant does not contest that] . . . the first level grievance is . . . not returned, the prisoner would have exhausted available administrative remedies because the process beyond the level one grievance would have been rendered unavailable to the prisoner." Id. Summary judgment will not, therefore, be granted on this ground.

In summary, due to Thomas's failure to exhaust his administrative remedies, the Court GRANTS the BCCF Defendants' motion for summary judgment as to Thomas's claim related to verbal harassment and racial discrimination. The Court does not grant summary judgment on exhaustion grounds as to any of Thomas's other claims, and will therefore proceed to discuss Defendants' other arguments for summary judgment for the remaining claims.

### B.      Claims Related to Mail Interference

The BCCF Defendants also argue that Thomas's mail claims fail as a matter of law because he cannot substantiate his assertions that he was harmed by this conduct.  [ECF No. 96 at 8].  Interference with incoming mail may implicate a number of rights.  As relevant here, courts have afforded greater protections to incoming <u>legal</u> mail,[8] like correspondence from an attorney, than to <u>non-legal</u> mail, because such mail may "impact prisoner's legal rights, the attorney-client privilege, or the right of access to the courts."  <u>Ojo v. Hillsborough Cty. Dep't of Corr.</u>, No. 11-cv-00210, 2011 WL 6968320, at *4 (D.N.H. Dec. 21, 2011) (internal quotation marks and citations omitted), <u>R. & R. approved</u>, No. 11-cv-00210, 2012 WL 72281 (D.N.H. Jan. 10, 2012), <u>aff'd</u> (Apr. 1, 2014).  As such, as the BCCF Defendants concede, unlike non-legal mail, "[g]enerally, prison officials cannot inspect legal mail except in the inmate's presence."  [ECF No. 96 at 8 (citing <u>Wolff v. McDonnell</u>, 418 U.S. 539, 577 (1974); 103 C.M.R. 481.11)].

Nevertheless, a plaintiff alleging that mail interference has violated his right to access to courts "must establish 'actual injury.'"  <u>Evicci v. Baker</u>, 190 F. Supp. 2d 233, 241 (D. Mass. 2002) (citing <u>Lewis v. Casey</u>, 518 U.S. 343, 349 (1996)).  In other words, a plaintiff must establish "that the defendant was responsible for or took actions that hindered the plaintiff's efforts to pursue a legal claim."  <u>Muldoon v. Dep't of Corr.</u>, No. 15-cv-13892, 2017 WL 506250, at *4 (D. Mass. Feb. 7, 2017) (citations omitted).  An injury "can manifest in different forms, including causing a plaintiff to miss court deadlines or actions that result in the loss, dismissal or rejection of a claim, but must demonstrate some actual prejudice," and a plaintiff does not "properly plead injury when he presents only general allegations that a case could have been affected by a defendant's actions."  <u>Id.</u> at *4 (citations omitted).  "[M]ere delay in being able to

---

[8] The BCCF Defendants do not contest that the mail at issue was legal mail.

work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Salameh v. Duval, No. 12-cv-10165, 2014 WL 691610, at *3 n.12 (D. Mass. Feb. 21, 2014) (quoting Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003)).

Thomas has generally alleged that the BCCF Defendants were "sabotaging [his] case," [ECF No. 22 at 4], but he has not identified any specific harms that he has suffered as a result of the alleged interference with his mail.  Thomas has not shown, for example, that the delays in receiving his mail or the missing pages of his mail caused him to miss a court filing deadline or lose the opportunity to raise a particular defense.  Even assuming that some documents had pages missing when they were delivered to him, Thomas's attorney was in possession of the documents at issue, so any missing pages could have been provided to him by his attorney.  And, as noted above, a delay in receiving mail from an attorney alone does not amount to an actionable violation of a plaintiff's access to the courts.  See, e.g., Perfetto v. Hanks, No. 18-cv-00554, 2020 WL 3213222, at *5 (D.N.H. Apr. 27, 2020) (finding that delays in receiving mail, without explanation of how those delays violated plaintiff's constitutional rights or harmed the plaintiff, was not actionable), R. & R. approved, No. 18-cv-00554, 2020 WL 3197748 (D.N.H. June 12, 2020), vacated (July 30, 2020), and R. & R. approved, No. 18-cv-00554, 2021 WL 949677 (D.N.H. Mar. 9, 2021); see also Salameh, 2014 WL 691610, at *3 n.12 (same).[9]  Without a showing that the challenged conduct "actually 'hindered his efforts to pursue a legal claim,'" Ojo, 2011 WL 6968320, at *5 (quoting Lewis, 518 U.S. at 351), a claim for relief alleging denial

---

[9] In his deposition, Thomas stated that he believed that the interference with his mail had a detrimental effect on his rights in his ongoing criminal case, specifically that it "[kept] [him] from making [his defense]" and that he "[couldn't] fully get [his] defense together because [he] need[ed]" the pages that were missing from his mail.  [ECF 97-1 at 132:3–18].  These allegations are conclusory, and the Court does not credit them.

of access to the courts fails.[10]   The Court finds that the BCCF Defendants are entitled to

summary judgment as to the three claims of interference with legal mail and their motion as to

these claims is <u>GRANTED</u>.

### C.     Claim Related to Recording of Attorney Meeting

As to Thomas's claim relating to the alleged recording of a meeting with his attorney,

Defendants argue that summary judgment is warranted because Thomas has not established

supervisory liability against Defendant Montero.  [ECF No. 96 at 10].

> Although Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*, supervisory officials may be liable on the basis of their own acts or omissions.  In the context of Section 1983 actions, supervisory liability typically arises in one of two ways: either the supervisor may be a primary violator or direct participant in the rights-violating incident, or liability may attach if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.

---

[10] The Court acknowledges that some courts have held an "actual injury" may not be required and that a mail interference claim can be predicated on a violation of attorney-client privilege and the right to counsel.  <u>See, e.g.</u>, <u>Jones v. Brown</u>, 461 F.3d 353, 359 (3d Cir. 2006) (holding that a "prisoner alleging that officials have opened his legal mail outside of his presence and thereby violated his First Amendment rights need [not] allege any consequential injury stemming from that violation, aside from the violation itself").

That said, to state a claim, such inference must still occur "with some regularity."  <u>Anctil v. Fitzpatrick</u>, No. 15-cv-00107, 2018 WL 6579153, at *15 (D. Me. Dec. 13, 2018) (quoting <u>Gallant v. Delahanty</u>, 43 F.3d 1456 (Table), 1994 WL 697283, at *2 (1st Cir. 1994).  Several incidents of mail tampering, as Thomas alleged here, typically do not establish a constitutional violation.  <u>See</u> <u>Perfetto</u>, 2020 WL 3213222, at *5 (finding that three incidents of mail not being delivered did not amount to a regular or frequent denial of [plaintiff's] legal mail); <u>Davis</u>, 320 F.3d at 352 (finding that "two instances of mail interference [were] insufficient to state a claim for denial of access to the courts"); <u>Ojo</u>, 2011 WL 6968320, at *4 (holding that two incidents of legal mail being opened outside of plaintiff's presence and one incident of legal mail being delivered not in an envelope did not demonstrate an ongoing practice of interfering with legal mail).  Thomas's conclusory allegations that the interference with his mail was "purposefully done" and was "targeted by these officers," [ECF No. 22 at 2–3], likewise fall short of demonstrating the requisite regularity and intentionality to establish a pattern or practice of mail interference.  Thus, even assuming Thomas is raising a right-to-counsel claim, Defendants are nonetheless entitled to summary judgment.

Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (internal citations and quotation marks omitted).  "In either case, the plaintiff in a Section 1983 action must show 'an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization,' between the actor and the underlying violation."  Id. (quoting Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999)).  Thomas has not identified any action that Defendant Montero took related to the alleged recording of his meeting with his attorney.  He has asserted only that, after the fact, Defendant Montero insisted he file an inmate request form related to the incident, rather than a grievance, then denied the request, insisting that no recording had occurred, and refusing to further investigate the incident.

Courts have found that recording attorney-client communications in a custodial setting may violate: (1) the constitutional right of access to the courts, where the incarcerated individual has no alternative means of communication with counsel and, as discussed above, suffered an "actual injury,"[11] (2) attorney-client confidentiality and therefore the constitutional right to counsel, where such recording is an unreasonable interference under the circumstances,[12] or (3)

---

[11] See, e.g., McIntosh v. United States, No. 14-cv-07889, 2016 WL 1274585, at *23 (S.D.N.Y. Mar. 31, 2016).

[12] See Case v. Andrews, 603 P.2d 623 (Kan. 1979):

> [Because] [t]he Sixth Amendment [guarantees a] right to the effective assistance of counsel . . . [m]ost courts have required some justification, generally security reasons, for any intrusion on the privacy of the attorney-client consultation, Adams v. Carlson, 488 F.2d 619, 632 (7th Cir. 1973), and do not impose the "compelling state interest" standard of justification showing of harm or prejudice. . . .  We have concluded that under the factual circumstances presented, the . . . [jail's] policy of visually monitoring all consultations between attorneys and clients is an unreasonable interference with the right to confidential attorney-client communications.  The confidentiality of communications between an attorney and his client who is charged with crime should be carefully protected by the courts.  Such communications in a jail setting should be afforded as much privacy as is

the Fourth Amendment, where the recording is done secretly and the attorney and client have a

reasonable expectation of privacy.[13]  Here, regardless of which legal theory is being relied upon,

the record does not support a finding that Defendant Montero was a "primary violator or direct

participant in the rights-violating incident" or that he "supervise[d], train[ed], or hire[ed] a

subordinate with deliberate indifference toward the possibility that deficient performance of the

task eventually may contribute to a civil rights deprivation."  Sanchez, 590 F.3d at 49 (quoting

Camilo-Robles, 175 F.3d at 44).  Therefore, the BCCF Defendants' motion is GRANTED as to

this claim.[14]

---

> reasonably possible under the circumstances.  If there is a private room readily
> available, it should be made available to the jail inmate and his attorney.  If there is
> no private room available, then as much privacy should be afforded as is reasonably
> possible under the circumstances.

Id. at 625–26; cf. Scott v. United States, No. 06-cr-40006, 2013 WL 1149938, at *4 (D. Mass.
Mar. 18, 2013) ("'Not every restriction on counsel's time or opportunity . . . to consult with his
client . . . violates a defendant's Sixth Amendment right to counsel.' . . . The Sixth Amendment
right to counsel does not guarantee a 'meaningful relationship' between the defendant and his
counsel." (quoting Morris v. Slappy, 461 U.S. 1, 11, 13–14 (1983))).

[13] See, e.g., United States v. Novak, 531 F.3d 99, 103 (1st Cir. 2008); Lonegan v. Hasty, 436 F.
Supp. 2d 419, 436 (E.D.N.Y. 2006).

[14] Even assuming that Thomas had shown that Defendant Montero or another named defendant
was responsible for recording this attorney meeting, the record does not support a finding that
Thomas's right to access to courts was violated, because he has not shown that he suffered an
actual injury to any legal claims as a result of the alleged recording, or that he did not have
alternative means of communicating with his attorney.  The Court also finds that, as with the
mail tampering claims, a single allegedly recorded attorney conversation does not rise to a
constitutional violation of access to counsel.  See Gallant, 43 F.3d 1456 (Table).  Finally, the
record does not support that Thomas's Fourth Amendment rights were violated because, as he
conceded at his deposition, he saw the recording equipment before the meeting began, meaning
that he either did not have a reasonable expectation of privacy and/or implicitly consented to the
recording.  See Novak, 531 F.3d at 103 (holding that jail's recording of attorney phone calls did
not present a Fourth Amendment issue because incarcerated individual "was made aware, both
through posted signs and recorded messages, that his calls [with his attorney] would be
monitored and recorded[,] [h]e did not ask prison officials if there was a way to communicate
with his attorney without having his calls monitored, [he] did [not] ask either his Federal

### D.      Eighth Amendment Claim for Inadequate Medical Care

Defendant Jarvis argues she is entitled to summary judgment because Thomas cannot establish that he had a "serious medical need [that] went unmet" or that Defendant Jarvis was deliberately indifferent to any serious medical need.  [ECF No. 92 at 11–14].  Thomas responds that Defendant Jarvis refused to provide him medication for a serious mental health need, and that Defendant Jarvis was aware his "mental health condition was severe."  [ECF No. 99 at 1].

The Eighth Amendment protects prisoners from "deliberate indifference to serious medical needs," Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161–62 (1st Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 105–06 (1976)), meaning that a violation arises when medical care is "so inadequate as to shock the conscience," id. at 162 (quoting Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir. 1991)).  "In order to succeed in an Eighth Amendment claim based on denied or inadequate medical care, a prisoner must satisfy: '(1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need.'"  Spencer v. City of Boston, No. 13-cv-11528, 2015 WL 6870044, at *7 (D. Mass. Nov. 6, 2015) (quoting Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014)) (further citation omitted).

As to the objective component, a plaintiff must show a "deprivation" that is "'objectively, sufficiently serious.'"  Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (quoting Burrell v. Hampshire Cnty., 307 F.3d 1, 8 (1st Cir. 2002)).  For purposes of the Eighth Amendment, a medical need is "serious" if it "has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity

---

Defender or [his attorney] how to avoid the monitoring of calls[,] [and h]e did not choose alternate means to communicate with [his attorney], such as by letter or in person," and therefore consented to the recording).

for a doctor's attention." Kosilek, 774 F.3d at 82 (quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990)). "A significant risk of future harm that prison administrators fail to mitigate may suffice under the objective prong." Id. at 85 (citations omitted). The objective prong "does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing." Id. at 82 (citations omitted).

"For the subjective inquiry, the Supreme Court has specified that deliberate indifference requires that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" Leavitt, 645 F.3d at 497 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Deliberate indifference refers to "'a narrow band of conduct,' and requires evidence that the failure in treatment was purposeful." Kosilek, 774 F.3d at 83 (quoting Feeney, 464 F.3d at 162). "The obvious case [of deliberate indifference] would be a denial of needed medical treatment in order to punish . . . ." Id. (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)). "But deliberate indifference may also reside in 'wanton' decisions to deny or delay care where the action is recklessness, 'not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.'" Watson, 984 F.2d at 540 (first quoting Wilson v. Seiter, 501 U.S. 294, 302 (1992); and then quoting DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)).

Although Thomas asserts that Defendant Jarvis and other providers "knew [his] mental health condition was severe," the Court finds that even when viewing the facts in the light most favorable to Thomas, a reasonable factfinder could not conclude that Defendant Jarvis or others were deliberately indifferent to Thomas's medical needs. Although Thomas told Defendant Jarvis at their first visit in June 2019 that he had a history of depression and anxiety and had been

taking medication, the record shows that: (1) Thomas had not refilled those medications in the several months before his incarceration and (2) from his first visit in June 2019 through his visit in September 2020, he consistently reported that he was not experiencing current mental health symptoms.  He did not report any mental health symptoms until describing having nightmares at a December 2020 visit with another provider, and then additional symptoms at his January 22, 2021, visit with Defendant Jarvis.  At this January 22, 2021 visit, Defendant Jarvis referred Thomas to a psychiatrist.  Within several weeks, he met with a psychiatrist, was diagnosed with a not-otherwise-specified mood disorder and PTSD, and prescribed medication.  Further, the record does not establish that, as to Defendant Jarvis or other providers, any "failure in treatment was purposeful."  Kosilek, 774 F.3d at 83.  Thomas may well have required treatment much earlier than he received it, but the record does not meet the high bar for deliberate indifference required to establish a constitutional violation for inadequate treatment.  Defendant Jarvis's motion for summary judgment is therefore GRANTED.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment, [ECF Nos. 91, 95], are GRANTED.

**SO ORDERED.**

July 21, 2023                                             /s/ Allison D. Burroughs
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE